UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| NATIONAL WASTE & RECYCLING ASSOCIATION, | ) ) ) | |
| Plaintiff/Counter Defendant, | ) ) | |
| | ) | 3:15-cv-00158-RLY-MPB |
| vs. | ) ) | |
| WARRICK COUNTY SOLID WASTE MANAGEMENT DISTRICT, | ) ) ) | |
| Defendant/Counter Claimant. | ) | |

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW
ON NWRA'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, the National Waste & Recycling Association ("NWRA"), filed this

action for declaratory and injunctive relief against Defendant, Warrick County Solid

Waste Management District (the "District").  NWRA's Verified Complaint includes four

counts: Count I alleges that the District violated the dormant Commerce Clause by

granting a local private contractor the exclusive right to *process* solid waste and

recyclable materials generated in Warrick County, Indiana.  (Filing No. 1, Verified

Complaint at 14).  Count II alleges that the District violated the dormant Commerce

Clause by granting that same contractor the exclusive right to *collect* solid waste and

recyclable materials in certain portions of Warrick County because the District did not

allow out-of-state companies to compete on an even playing field.  (*Id.* at 15).  Count III

alleges that the District exceeded its statutory authority under Indiana law when it

established the exclusive curbside collection program.  (*Id.* at 16).  Count IV alleges that

the District violated certain Indiana statutes when it issued the request for proposal ("RFP") for the curbside collection program. (*Id.* at 18).

On the same day NWRA filed its Complaint, it separately moved for a preliminary injunction of the District resolutions that created the exclusive waste and recycling collection and processing program based on all four counts. (*See* Filing No. 5). The court held an evidentiary hearing on NWRA's Motion for Preliminary Injunction on January 21-22, 2016. At the hearing, NWRA opted to only pursue Counts II and III.

The District filed a Verified Counterclaim against NWRA for preliminary and permanent injunctive relief. (Filing No. 30, Verified Counterclaim). Though it is somewhat unclear what claims the District has advanced, the District appears to seek an injunction barring NWRA's members from violating the resolutions at issue.

The court, having weighed the evidence and considered the applicable law, now holds that NWRA is entitled to a preliminary injunction of the District's Resolution 2015-03, which creates an exclusive curbside solid waste and recycling collection program in Warrick County. Therefore, the court **GRANTS** NWRA's motion for a preliminary injunction, and enters the following findings of fact and conclusions of law.

# I. FINDINGS OF FACT[1]

## A. The Parties

1.      NWRA "is an association that represents the private sector waste and recycling industry companies who participate in that commercial enterprise."  (Kevin Kraushaar Test. 28:10-13).

2.      NWRA is incorporated in Illinois and has its principal place of business in Washington, D.C.  (*Id.* 28:14-18).

3.      NWRA's mission "is to advocate, to educate, to conduct safety oversight and reviews of our members, and to advance the mission of the association's members, to allow them to compete fairly and reasonably, to continue to provide service in a creative business environment where that is economically and environmentally feasible."  (*Id.* 29:3-9).

4.      NWRA has a history of engaging in litigation in support of its members' interests.  (*Id.* 30:7-31:2).

5.      Advanced Disposal ("Advanced"), Republic Services, Inc. ("Republic"), and Eric Gries Disposal ("Gries") are members of NWRA and participate in NWRA's Indiana Chapter.  (*Id.* 29:13-21).  NWRA's Indiana Chapter members directed NWRA to bring this lawsuit on their behalf.  (*Id.* 31:15-32:13).

---

[1] Testimony from the preliminary injunction hearing is cited as "[witness name] Test. [page:line]."  Evidence submitted at the hearing is cited as "[NWRA's or District's] PI Ex. [designated by alphabet or number] at [page number]."

6. Advanced, Republic, and Gries compete in Warrick County to provide waste hauling services, including curbside solid waste and recycling collection services. (*Id.* at 29:15-21).

7. Since at least September 2013, Advanced has offered residential curbside waste and recycling collection services all over Warrick County. (Scott Bradshaw Test. 39:6-25).

8. There are some limited areas of the county, however, that are not safe or economical for Advanced to provide its services. (*Id.* 39:12-13). For example, if an area can only be accessed by a narrow road, it may not be safe or even legal for Advanced to service that area. (*Id.* 39:15-17). Also, there are some very remote, rural areas of Warrick County that Advanced may choose not to service because of cost. (*Id.* 39:17-19).

9. Advanced also operates waste processing and disposal facilities, including a landfill in Pike County, Indiana and a waste transfer station on County Line Road (on the border of Warrick and Vanderburgh Counties) where waste is processed before being sent to a landfill for disposal. (*Id.* 36:14-17).

10. Historically, Advanced has taken the recyclable materials it collects to Tri-State Resource Recovery in Evansville, Indiana for processing. (*Id.* 83:23-84:3).

11. Advanced currently charges $11.97 per month per home for curbside solid waste and recycling collection services in Warrick County. (*Id.* 62:23-63:2). This includes once a week unlimited household trash collection and every other week recycling collection at the curb. (*Id.* 62:25-63:2).

4

12.     The District is a creature of statute, and was formed pursuant to Indiana Code § 13-9.5, which has since been repealed and recodified at Indiana Code § 13-21 *et. seq.*

13.     Counties may join with each other to create a joint solid waste management district, or a county may designate itself as a county solid waste management district. Ind. Code § 13-21-3-1(a).

14.     In Warrick County's case, it formed its own county solid waste management district around 1990 or 1991.  (Don Williams Test. 108:1-2).

15.     The Board of Directors of a solid waste management district consists of seven appointed officials.  Ind. Code § 13-21-3-5(a).

16.     Subject to certain statutory limitations, including those at issue in this case, solid waste management districts have the power to adopt resolutions regulating waste management services within their jurisdiction.  Ind. Code § 13-21-3-12(a)(17).

**B. The District's Plan to Build a Recycling Processing Center**

17.     The Indiana General Assembly has established a goal for the state to recycle at least 50% of its municipal waste.  Ind. Code § 13-20-25-1.  (Richard Scott Anslinger Test. 139:12-18; Marlin Weisheit Test. 81:2-6; Williams Test. 108:9-15).

18.     On April 6, 2011, the District's Board hired a new Superintendent, Richard Scott Anslinger, with the goal of having him increase recycling participation and develop a recycling processing center.  (Anslinger Test. 139:19-140:4; Williams Test. 114:7-11).

19.     When Mr. Anslinger was hired, the participation rate for recycling in Warrick County was approximately 15-20%.  (Anslinger Test. 144:20-145:7; Weisheit Test. 85:16-17; Williams Test. 109:13-14).

20.     Through his prior employment with the Indiana Department of Environmental Management ("IDEM"), Mr. Anslinger was familiar with the curbside and drop-off center efforts in many communities, including Clark County, Spencer County, Posey County, Gibson County, Perry County, and Vanderburgh County.  (Anslinger Test. 136:3-137:16).

21.     The District spent several years conducting research into ways to improve recycling in Warrick County.  (Anslinger Test. 147:14-148:8; Weisheit Test. 82:22-83:7; Williams Test. 114:7-11).

22.     The District's investigation involved site visits at other facilities, reviews of limited subsidized programs that had been put in place, interviews with operators of successful programs, contact with local waste haulers, canvasing of county drop-off sites, public complaints and input, comments and input at public meetings, pricing investigations and comparisons, and feasibility studies by separate professional organizations.  (Anslinger Test. 140:15-141:14, 143:6-10, 144:13-145:7, 146:19-22, 147:11-149:13, 154:23-155:21, 157:14-159:12, 161:3-162:22, 170:20-172:22; Joe Schitter Test. 53:23-55:18, 62:18-64:2; Weisheit Test. 80:4-83:7, 85:5-86:4; Williams Test. 109:9-25, 111:1-113:25).

23.     Mr. Anslinger regularly communicated his findings from his investigations to Board members via public meetings and private discussions.  (Anslinger Test. 154:9-22, 159:18-24, 161:3-18, 163:3-6; Weisheit Test. 84:8-10).

24.     In the beginning of 2013, Mr. Anslinger first became acquainted with Jordan Aigner.  (Anslinger Test. 89:9-15).

25.     Mr. Aigner was and is still affiliated with local Warrick County company Aigner Construction and its related businesses.  (Jordan Aigner Test. 238:4-6).

26.     Around the time Mr. Aigner and Mr. Anslinger first met, Mr. Aigner expressed his interest in entering into a partnership with the District to construct a recycling processing center.  (Anslinger Test. 89:16-90:11).

27.     As discussions with Mr. Aigner progressed, Mr. Anslinger eventually presented the preliminary plan to the District's Board at their September 19, 2013 meeting.  (*Id.* 90:22-91:19; *see also* NWRA's PI Ex. 24 at 2).

28.     On November 19, 2013, Aigner Construction and the District entered into a confidentiality agreement concerning "a public-private partnership for the purpose of building a recycling drop-off and processing facility in Warrick County, Indiana." (NWRA's PI Ex. 34 at 1).

29.     On January 10, 2014, Mr. Anslinger informed Mr. Aigner that he was going to recommend to the District Board that Mr. Aigner draft all of the construction specifications for the project.  (Anslinger Test. 96:14-22; NWRA's PI Ex. 50 at Bates # Jordan 224).

30.     At the District's January 16, 2014 meeting, Mr. Anslinger in fact proposed, and the District Board agreed, that Aigner Construction complete design specifications that could be incorporated into an RFP for the proposed recycling drop-off and processing facility.  (Anslinger Test. at 96:23-97:20; *see also* NWRA's PI Ex. 4 at 2).

31.     In the weeks following that meeting, the scope of the project expanded dramatically, as Mr. Aigner suggested to Mr. Anslinger that the District include the construction of a solid waste processing center and waste-to-energy facility, along with the recycling center, as part of the RFP.  (Anslinger Test. 109:23-110:3; NWRA's PI Ex. 28 at Bates # 1947).

32.     Mr. Aigner presented his plan to the District Board at their February 27, 2014 meeting.  (NWRA's PI Ex. 5 at 2).  The plan would include three phases of construction.  (*Id.*).  Phase I would be a 10,000 square foot recycling drop off and interim processing center in Chandler, Indiana (the "Chandler Facility").  (*Id.*).  Phase II would be a 40,000 square foot recycling sorting, storage, and processing center located on Pelzer Road in Warrick County (the "Pelzer Road Facility").  (*Id.*)  Phase III would include a waste processing center (the "Transfer Station") and a waste-to-energy facility.  (*Id.*; *see also* NWRA's PI Ex. 27 at 1).

33.     Also at the District's February 27th meeting, the District's attorney stated that once the waste-to-energy facility was operational, the District had the authority by statute to adopt a resolution ordering all trash collected in Warrick County be brought to this facility.  (*Id.*).

8

34.    A mandate to send all trash or recyclable materials to a particular facility within a governmental unit for processing is generically known as "flow control."  *See, e.g., C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 386 (1994).

**C. The District's "Findings of Fact"**

35.    At the District's February 27, 2014 meeting, the District adopted "Resolution 2014-01 of the Warrick County Solid Waste Management District Regarding a Build Operate Transfer Agreement."  (NWRA's PI Ex. 6 at 1; Ex. 5 at 3).

36.    Resolution 2014-01 consists of five sections.  (NWRA's PI Ex. 6).

37.    The first section of Resolution 2014-01 includes the following determinations of Mr. Anslinger:

1.    There is no recycling processing and sorting center ("RPSC") currently located in Warrick County, Indiana;

2.    The District is not aware of any plans of any private sector entity for the construction and operation of a RPSC in the District;

3.    The Superintendent has learned from representatives of local private sector entities (Advance [sic] Disposal, Republic Services, and other private sector entities) that have indicated no plans and/or interest in the construction and operation of a RPSC in the District;

4.    Vendors using recycling services of private sector entities within the District have indicated a need exists for more reasonably priced services such as those to be offered by the District;

5.    Some private sector businesses within the District have indicated their desire to utilize more reasonably priced recycling services offered by the District;

6.    Currently there are significant portions of the District include [sic] residential areas that have no curbside recycling services offered to them; and

7.    The proposed RPSC would benefit the public health, welfare and safety of the residents of the District because it will:

    a.    Promote proper handling and management of waste within Warrick County;

    b.    Provide for expansion of the current Curbside Single Stream Recycling Program;

    c.    Reduce District operation costs by reducing transportation and labor costs;

    d.    Allow the District to recover the commodity values and therefore offset the Districts dependency on property taxes; and

    e.    Provide the District with opportunities to redirect the District's Waste Stream from landfills by use of alternate waste handling methods which includes Recycling & Waste to Energy Projects.

(*Id.* at 1-2).

38.    Section 2 states it is Mr. Anslinger's desire to "construct facilities within Warrick County to allow for the processing, sorting, and storage of recyclable materials." This construction would be completed in three phases, as described above.  (*Id.* at 2).

39.    Section 3 states Mr. Anslinger proposes "entering into a public-private partnership with a private entity for a Build Operate Transfer Agreement ('BOT Agreement') to construct, operate, and eventually transfer (if feasible) all three (3) phases of the RPSC."  (*Id.*).

10

40.     Section 4 states that the Board agrees with Mr. Anslinger's determinations and authorizes the District to begin the public-private partnership process.  (*Id.*).

41.     Section 5 states, "[T]he District may utilize its own workforce to ultimately staff and operate the RPSC."  (*Id.*).

42.     Mr. Anslinger, who made the determinations in Resolution 2014-01, testified that Resolution 2014-01 had nothing to do with the curbside collection program that the District adopted more than one year later:

> Q: Now, this particular resolution [Resolution 2014-01] only deals with the recycling facility that was subject to the BOT contract at that time, correct?
>
> A: Yes.
>
> Q: Now, you also previously testified that no determinations in this 2014-01 resolution related in any way to waste hauling, correct?
>
> A: True.
>
> Q: There's no assessment in this resolution about this -- whether or not there are any solid waste haulers available at a reasonable price in Warrick County, true?
>
> A: True.
>
> Q: Was that determination ever made subsequent to this resolution?
>
> A: I'm sorry?
>
> Q: There was never a subsequent determination made as to what waste haulers were available in Warrick County and at what costs?
>
> A: No.  No.
>
> Q: This resolution doesn't deal with the district's curbside program in any way, does it?
>
> A: No.

Q: And the district board never made those findings as to the curbside program prior to that being implemented almost a year and a half later, right?

A: No.

(Anslinger Test. 113:22-114:22).

43.    Further, Don Williams, who was President of the District Board at the time Resolution 2014-01 was adopted, also testified that Resolution 2014-01 did not contain findings of fact for the future curbside program:

Q: There's no findings in 2014-01 with respect to waste hauling.

A: No.

. . .

Q: So where in 2014-01 do you see any cost comparisons as to waste hauling in Warrick County at that time?

A: There's none there.

Q: Is there any comparison or identification of any facts related to waste hauling in Warrick County at that time?

A: No, not there.

Q: Because no findings were done, right?

A: Not there.

(Williams Test. 127:4-128:7).

44.    With Resolution 2014-01 in place, the District proceeded with developing an RFP for the proposed public-private partnership to construct Phases I, II, and III.

### D. The RFP to Construct Phases I, II, and III

45.     As directed by the District Board, Mr. Aigner developed the design specifications for all three phases of the construction project.  (Anslinger Test. 108:4-9).

46.     The District provided the remaining pages of the RFP, which set forth the terms of the bidding.  (*Id.* 98:21-99:7).

47.     One month before the RFP was published and made available to other potential bidders, the District's counsel provided Mr. Aigner with a draft of the sections of the RFP the District was responsible for putting together.  (*Id.* 99:24-100:24; Aigner Test. 202:3-204:4; *see also* NWRA's PI Ex. 36).

48.     Thus, before any other potential bidder was given an opportunity to view the RFP, Mr. Aigner, who had himself drafted the technical portions of the RFP, was given the opportunity to review the complete document and provide the District with comments.  (Anslinger Test. 101:18-23).

49.     On March 5, 2014, the District published the RFP for Phases I, II, and III. (NWRA's PI Ex. 48 at 1).  The deadline to submit responses to the RFP was March 28, 2014 at noon.  (*Id.*).

50.     Twelve days after the RFP was released, on March 13, 2014, Mr. Aigner formed Renewable Resources, LLC ("Renewable").  (Aigner Test. 199:18-23).

51.     Renewable was the only bidder on the RFP.  (Anslinger Test. 111:19-21).

52.     The RFP Scoring Committee suggested a few changes to Renewable's bid, and the District then voted to approve Renewable's proposal.  (*Id.* 112:3-9).

53.     On November 7, 2014, the Warrick County Board of Commissioners entered into a real estate lease agreement with Renewable.  (NWRA's PI Ex. 53 at 1).

54.     The lease is for 209 acres of property for 99 years at a rent of $1.00 per year.  (*Id.* at 1, 13).

55.     Pursuant to the lease, the Commissioners are required to pass an ordinance implementing mandatory flow control upon completion of the Transfer Station component of Phase III, which would direct all solid waste collected within Warrick County to the Transfer Station being constructed by Renewable.  (*Id.* at 3).

56.     If the Commissioners fail to pass such an ordinance, the County must purchase the Transfer Station from Renewable for a price equal to the cost of the facility plus a 20% profit.  (*Id.*).

57.     Mr. Aigner testified that Renewable has not released the Commissioners from that contractual term.  (Aigner Test. 225:15-20, 259:24-25).

58.     Renewable has submitted a solid waste processing permit application to IDEM to construct and operate the Transfer Station, but IDEM has not yet reached a decision whether to grant Renewable's application.  (*Id.* 223:6-224:3).

59.     Renewable plans to operate the Transfer Station as the permittee until such undetermined time as the District agrees to take it over.  (*Id.* 227:24-228:6).

60.     Renewable does not have the necessary permits to construct a waste-to-energy facility, (*Id.* 232:19-23), and the District testified the project may never actually be pursued.  (Weisheit Test. 101:19-24).

### E. The Curbside Collection RFP

61.     In the summer of 2015, the District released a new, second RFP for a private company to provide exclusive curbside solid waste and recycling collection services in Warrick County.  (District's PI Ex. L).

62.     The RFP was created by a design committee after consulting Mr. Bradshaw from Advanced.  (Wendy Wary Test. 31:7-34:19).

63.     The RFP sought "bids to provide once-a-week trash service at the curb and every-other-week recycling service collection at the curb, given various size carts and colors, and to deliver the waste to a facility at a disposal rate of $55 per ton and the recyclables to the district's recycling center."  (Bradshaw Test. 40:25-41:5).

64.     There were ultimately four options in the RFP.  (*Id.* 41:6-9).  The primary difference in the options was the area of the county to be serviced.  (*See* District's PI Ex. L at 4-5).

65.     All of the options were based on a $55 per ton tipping fee to Renewable's new transfer station.  (Bradshaw Test. at 52:24-53:2).

66.     Mr. Anslinger initially sent information about the curbside collection RFP to four companies, including Advanced, Republic, and Gries.  (Anslinger Test. 179:10-15; Bradshaw Test. 48:24-49:9).

67.     Renewable was subsequently given a copy of the RFP after it requested one.  (Anslinger Test. 179:14-23).

68.     Republic, Advanced, and Renewable attended the pre-bid meeting, made comments, and offered suggestions.  (Aigner Test. 240:14-24).

69.     Those same three companies responded to the RFP by submitting bids. (Wary Test. 35:12-36:11).

70.     The bids were sent to a Scoring Committee for review.  (*Id.* at 35:12-13).

71.     Mr. Anslinger both served on and chose the members of the Scoring Committee, which included District Board member Greg Richmond.  (Anslinger Test. 115:13-116:1).

72.     The Scoring Committee believed that Republic had failed to certify it would operate in compliance with all federal and state laws, so its bid was ultimately not considered.  (Wary Test. 35:14-36:8).

73.     Only the bids from Advanced, an out-of-state company, and Renewable, a local company, remained to be evaluated substantively.  (*Id.* at 36:9-11).

74.     The Scoring Committee considered the bids submitted by Advanced and Renewable to be "very close," with both having aspects that were attractive.  (Greg Richmond Test. 12:22-13, 25:14-17; Wary Test. 37:24-39:20, 42:1-17; Schitter Test. 60:10-14, 62:7-12).

75.     The Scoring Committee viewed certain elements of Renewable's proposal, including its education plan, superior to that of Advanced.  (Bradshaw Test. 65:12-16; Anslinger Test. 181:9-17; Richmond Test. 13:2-5; 25:21-26:16; Wary Test. 42:4-10, 44:25-45:10; NWRA's PI Ex. 14 at 2).

76.     The Scoring Committee viewed certain elements of Advanced's proposal, including its billing and experience, superior to that of Renewable.  (Bradshaw Test.

65:9-11; Anslinger Test. 180:24-181:6; Richmond Test. 13:2-5; Wary Test. 42:11-17; Schitter Test. 62:12-17; NWRA's PI Ex. 14 at 2).

77.     Renewable had never before provided any waste or recycling services of any kind.  (Anslinger Test. 119:2-5).

78.     The Scoring Committee met with representatives of Advanced and Renewable to discuss their proposals.  (Wary Test. 36:25-37:6).

79.     Advanced's bid for Option 1 (the "county-wide" option), which was the Scoring Committee's preferred option initially, was $14.53 per household per month. (Bradshaw Test. 51:6-52:20).

80.     Advanced included an alternative bid of $11.97 if it could take the waste to its own transfer facility instead of paying the above-market rate tipping fee of $55 per ton to take the waste to Renewable's new facility.  (*Id.* 52:13-20).

81.     Renewable's bid for Option 1 was $15.00 per household per month. (Anslinger Test. 121:1-9).  Renewable also had suggested adding an opt-out to Option 1. (Wary Test. 38:25-39:1).

82.     Renewable had an advantage over other companies bidding on the project because the terms of the RFP required waste to be sent to Renewable's to-be-built Transfer Station at a tipping fee of $55 per ton.  As the permittee and operator of the Transfer Station, Renewable would be paying the $55 per ton tipping fee to itself when curbside waste was sent there for processing.  (Bradshaw Test. 57:24-58:11).

83.     Representatives of the Scoring Committee then attended the District's August 3, 2015 meeting to provide an update on the bids, although no recommendation

regarding which bid should be accepted was made at that time.  (Wary Test. 40:1-15; *see also* NWRA's PI Ex. 14).

84.    At that meeting, the Scoring Committee announced that Advanced was the lowest bidder, had the most experience, and was willing to provide the most services. According to the Scoring Committee, accepting Advanced's bid would "likely be the smoothest transition for Warrick County residents."  (NWRA's PI Ex. 14 at 1-3).

85.    During this report, the terms of the individual RFP responses, including the prices, were disclosed.  (*Id.* at 1-2).

86.    Yet, instead of selecting one of the four options in the RFP, the Scoring Committee then proposed that both Advanced and Renewable submit bids for a fifth, new service option.  (*Id.* at 3).  This option was essentially Option 1 with an opt-out for citizens who wanted to take their own trash and recycling for disposal and processing. (Anslinger Test. 121:23-24).

87.    Mr. Bradshaw of Advanced testified that, in his twenty-five years of experience, he had never had his and his competitor's bids read aloud and then been asked to go back and provide a new bid.  (Bradshaw Test. 57:11-15).

88.    Both Advanced and Renewable were free to select any price for their bid on Option 5, higher or lower than their price for Options 1-4.  (Wary Test. 42:22-43:21; Schitter Test. 61:1-20; Anslinger 184:12-18; Aigner Test. 245:13-19).

89.    Advanced and Renewable submitted bids for Option 5, and the Scoring Committee evaluated them.  (Wary Test. 44:1-6).  Renewable lowered its price to $14.50,

three cents below Advanced's bid for Option 1.  (Bradshaw Test. 63:9-17).  Advanced

kept its price at $14.53.  (*Id.*).

90.    Renewable was therefore lowest bidder for Option 5 of the curbside

collection RFP.  (Williams Test. 129:1-9).

91.    Despite Renewable's changes, Advanced was chosen as the recommended

contractor by the Scoring Committee, (Wary Test. 44:19-21), and that recommendation

was announced at the District's August 11, 2015 meeting.  (Bradshaw Test. 64:9-12;

NWRA's PI Ex. 15 at 1).

92.    After the Scoring Committee's recommendation was made, the District, on

the motion of Mr. Richmond, called a recess for approximately 50 minutes.  (Anslinger

Test. 128:25-129:3; NWRA's PI Ex. 15 at 2).

93.    After the recess, representatives from Renewable and Advanced were asked

to provide presentations to the Board, which they did.  (NWRA's PI Ex. 15 at 2).

94.    Mr. Richmond testified that he did not know Mr. Bradshaw but found him

to be "arrogant" during his presentation to the Board, (Richmond Test. 16:11-20),

whereas he had known Mr. Aigner since he was a boy and was acquainted with Mr.

Aigner's father, Jerry Aigner.  (*Id.* at 4:4-14, 16:9-10, 27:1-12).

95.    After the presentations, Mr. Richmond, who was a member of the Scoring

Committee, made a motion to accept Renewable's bid, contrary to the recommendation

of the Scoring Committee.  (NWRA's PI Ex. 15 at 5).

96.    Then the District voted 6-0 to accept the bid from Renewable—rejecting

the Scoring Committee's recommendation.  (*Id.*).

97.     The Board President at the time, Mr. Williams, testified that he preferred Advanced, but he ultimately voted for Renewable "because [he] didn't want a new local business thinking it had the most powerful political figure against them."  (Williams Test. 120:18-24).

### F. The District Establishes Flow Control and an Exclusive Curbside Program

98.     On August 19, 2015, the District passed two resolutions that established flow control to the solid waste and recycling facilities Renewable planned to construct and made Renewable the exclusive provider of curbside solid waste and recycling collection in the unincorporated areas of Warrick County:

a.     Resolution 2015-03, "A Resolution by the Warrick County Solid Waste Management District Board of Directors Establishing a Curbside Waste and Recycling Management Program," (District's PI Ex. T); and

b.     Resolution 2015-04, "A Resolution by the Warrick County Solid Waste Management District Board of Directors Directing All Recyclable Materials to the Pelzer Road Facility or to One of the District's Drop-off Centers."  (Filing No. 41-7).

99.     The District subsequently amended Resolution 2015-03 and rescinded Resolution 2015-04.  (NWRA's PI Ex. 19 at 2; *see* Filing Nos. 41-6, 41-8, 41-9).

100.     The amendments to Resolution 2015-03 removed the mandatory flow control requirement, and several of the District's witnesses testified that mandatory flow control is no longer in place.  (*Compare* Filing No. 41-4 at 4 *with* District's PI Ex. T at 4; *see* Aigner Test. 219:2-6).

20

101.     However, as noted previously, Renewable's lease with the County

Commissioners requires the Commissioners to pass a mandatory waste flow ordinance

upon completion of Renewable's Transfer Station, and Renewable has not released the

Commissioners from that obligation.  (NWRA's PI Ex. 53 at 3; Aigner Test. 225:15-20,

259:24-25).

102.     Further, in a September 9, 2015 email exchange between the District's

counsel and Mr. Aigner, Mr. Aigner wrote, "[W]e would have a hard time supporting no

ordinance at all."  (NWRA's PI Ex. 33).

103.     Nevertheless, because the District has assured the court that it has no

intention of passing a flow control ordinance in the future, (Weisheit Test. 86:20-22), the

court understands the flow control issue to be resolved at the present time.

104.     While mandatory waste flow control was removed, the exclusive nature of

the curbside collection program with Renewable was not changed.  Specifically,

Resolution 2015-03 (as amended), requires all "covered participants" to use Renewable's

curbside waste and recycling program.

105.     Covered participants include:

1.  Single-family, residential zoned properties;

2.  Multi-family, residential zoned properties that are able to utilize
    the [recycling and waste containers offered under the Program];

3.  Embedded Commercial zoned properties, defined as those
    businesses embedded within residential areas and also able to
    utilize the [recycling and waste containers offered under the
    Program]; and

21

4. Warrick County and Municipal government properties able to utilize the [recycling and waste containers offered under the Program].

(District's PI Ex. T at 2).

106. Further, services to covered participants "are subject to a determination by [Renewable] in conjunction with the District that it is economically feasible for those residents residing in remote areas of Warrick County be [sic] included in the Program." (*Id.*).

107. Covered participants have the option of "opting out" of the curbside waste and recycling program, and "[r]esidents of incorporated municipalities" are not covered participants unless their legislative councils join Renewable's program. (*Id.*).

108. Other companies besides Renewable are prohibited from serving covered participants, and any existing curbside collection contracts with these other companies that extend past August 19, 2016 are rendered void. (*Id.* at 3).

109. However, other haulers are still able to collect solid waste and recyclable materials from commercial, industrial, institutional, and municipal entities in Warrick County that utilize dumpsters. (Weisheit Test. 91:21-92:8; Williams Test. 122:2-13).

110. Any person who violates Resolution 2015-03 by serving covered participants is subject to civil penalties, court costs, and attorney's fees. (District's PI Ex. T at 8).

**G. Status Quo**

111. On November 25, 2015, the parties entered into an agreement whereby, until the court issued a ruling on NWRA's Motion for Preliminary Injunction, covered

22

participants were able to "use any hauler for waste and recycling pickup services." (Filing No. 25 at 1).

112.    During this interim period, the District was barred from "seek[ing] civil penalties, attorneys' fees, court costs, or any other fees from any person who provides waste and recycling pickup services to covered participants." (*Id.*).

## II. CONCLUSIONS OF LAW

### A. Associational Standing

1.    The District has not filed a motion to dismiss for lack of standing, but has nonetheless challenged NWRA's standing in various filings.

2.    "Organizations can . . . bring suit through associational standing—that is, standing on behalf of their members." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (citing *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996)).

3.    An organization has associational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

4.    To show that NWRA's members have standing to sue in their own right, NWRA must establish that its members have "suffered or [are] imminently threatened with (1) a concrete and particularized 'injury in fact' (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable

judicial decision." *Indiana v. EPA*, 796 F.3d 803, 809 (7th Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

5.    The first element of associational standing has been satisfied, as NWRA has demonstrated that (1) its members are imminently threated with an injury as a result of Resolution 2015-03, (2) their injuries are directly traceable to Resolution 2015-03, and (3) their injuries will be redressed if enforcement of Resolution 2015-03 is enjoined.

6.    The District did not dispute that Advanced and Republic would be harmed financially if Resolution 2015-03 is enforced.

7.    The District argues that NWRA has cleverly characterized its lawsuit as an action to enjoin a resolution in attempt to overcome inherent standing issues.  According to the District, the NWRA is actually challenging the exclusive curbside collection contract with Renewable, which is problematic because "government bodies are afforded nearly absolute discretion in purchasing services." *Hamrick's Diesel Serv. & Trailer Repair, LLC v. City of Evansville*, 935 N.E.2d 764, 767 (Ind. Ct. App. 2010).  This argument misses the mark though.  NWRA's Complaint and motion make clear that it has not sought to enjoin any District contracts.  Rather, NWRA seeks to enjoin a resolution.  The fact that an injunction against Resolution 2015-03 would, in turn, impact the District's contract with Renewable does not change this conclusion.

8.    The District also contends that there is no protected property interest in adherence by a government to established procedure.  Put another way, NWRA has allegedly failed to show that it has the right to bring an action asserting the statutes in Count III were violated.  However, Indiana Code § 13-21-3-12(a)(4) expressly provides

that a solid waste management district has "the power to . . . be sued." This language strongly suggests that the General Assembly intended to allow private lawsuits against solid waste management districts in order to ensure compliance with the statutes. *See also Hochstedler v. St. Joseph Cty. Solid Waste Mgmt. Dist.*, 770 N.E.2d 910 (Ind. Ct. App. 2002) (rejecting a property owner's claim that a solid waste management district violated Ind. Code § 13-21-14-1(a) on the merits, not procedural grounds). Therefore, the court finds NWRA has the right to bring Count III.

9.      The second element of associational standing is also met because the interests NWRA seeks to protect are germane to its purpose. NWRA's members maintain that they have been wronged by a process that favored local, in-state companies over national, out-of-state companies. NWRA therefore filed this lawsuit to ensure the District provides a level economic playing field. As Mr. Kraushaar made clear, part of NWRA's mission is guaranteeing its members are able to compete fairly with other providers.

10.      Regarding this second element, the District argues that a judgment for NWRA would threaten NWRA's members' curbside collection contracts with certain municipalities, such as the Town of Newburgh, located in Warrick County. That is incorrect. The contracts that NWRA's members have with municipalities for curbside waste and recycling services were entered into under a different statute than the statute that gives the District its authority. *Compare* Ind. Code § 36-9-30-5 (establishing a municipality's authority to regulate waste collection) with Ind. Code § 13-21-3-14, 14.5 (placing limitations on a solid waste management district's authority to regulate waste

collection).  Thus, there is no conflict of interest between NWRA's claims and its members' interests.  In fact, NWRA's Indiana Chapter members unanimously directed NWRA to bring this lawsuit on their behalf.

11.   The District has not argued that NWRA's members' participation as parties to this lawsuit is necessary.  Nonetheless, the court concludes that neither NWRA's claims nor the relief requested require the participation of its members as parties to this suit.  Therefore, the third element of associational standing is satisfied.

12.   Accordingly, NWRA has associational standing to bring this lawsuit.

**B. Preliminary Injunction Standard**

13.   "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

14.   A motion for preliminary injunctive relief is analyzed in two distinct phases.  *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015).

15.   In the initial, threshold phase, the party seeking injunctive relief bears the burden of showing that "(1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits."  *Id.* at 661-62.

16.   If the court determines that the moving party has satisfied its burden in the threshold phase, the court proceeds to the second, balancing phase.  *Id.* at 662.  The court then considers "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted" along with "(5) the effects, if any, that the grant or denial of the

26

preliminary injunction would have on nonparties (the 'public interest')." *Id.* In this second phase, the court uses a "sliding scale" to weigh potential harms against the movant's likelihood of success: "the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id.*

### C. NWRA's Motion for Preliminary Injunction

#### 1. Irreparable Harm

17.    To satisfy the "irreparable harm" prong, the moving party must show that the denial of preliminary injunctive relief "will cause harm to him that a final judgment will not be able to rectify." *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*, 803 F.3d 872, 876 (7th Cir. 2015).

18.    Without a preliminary injunction, Advanced may have to lay off or terminate employees, (Bradshaw Test. 62:11-19), which can constitute irreparable harm. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (collectively describing a list of harms, including "the potential loss of . . . employees," as "both real and irreparable"). To paraphrase the *Girl Scouts of Manitou Council* court, "[Advanced's] investment in these people, in both time and money, will be lost, as will their accrued knowledge and work capacity." *Id.* at 1089.

19.     If NWRA's members are unable to service many parts of Warrick County until obtaining a favorable judgment, they will likely lose goodwill[2] with their customers. *See Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997) ("[T]he plaintiff has suffered injury to its goodwill through the District's use of the name 'Meridian.'  Such damage can constitute irreparable harm for which a plaintiff has no adequate remedy at law."); *Gateway E. Ry. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[S]howing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages.").

20.     If Renewable is able to provide exclusive services during the course of this litigation but then the court ultimately issues a final judgment for NWRA, the loss in goodwill may make it difficult for NWRA's members to regain the customers they will have lost in the interim.[3]

21.     Therefore, the court finds that NWRA's members will suffer irreparable harm absent preliminary injunctive relief.

---

[2] *See* Black's Law Dictionary (10th ed. 2014) (defining "goodwill" as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase").

[3] The court recognizes that following the parties' temporary agreement—after many customers had been required to contract with Renewable following the passage of Resolution 2015-03— NWRA's members were able to entice some customers to return with a promotional price. However, it's unclear how many customers left Renewable and, more importantly, if those customers will remain with NWRA's members after the promotion expires.  Further, this price-slashing strategy of NWRA's members might not be as effective after obtaining a final judgment because customers will have worked with Renewable for quite some time by that point.  In other words, customers may become loyal to Renewable's brand over time and be reluctant to switch, even if a lower price is offered.

### 2. No Adequate Remedy at Law

22.     NWRA seeks only equitable relief in this case–declaratory judgment and a preliminary injunction, to be made permanent.  Indeed, as an association, NWRA is barred from seeking money damages on its members' behalf.  *See Sanner v. Bd. of Trade*, 62 F.3d 918, 923 (7th Cir. 1995) ("We are not aware of any cases allowing associations to proceed on behalf of their members when claims for monetary, as opposed to prospective, relief are involved.").

23.     Therefore, NWRA has no adequate remedy at law.  *See Gov't Suppliers Consolidating Services, Inc. v. Bayh*, 734 F. Supp. 853, 863 (S.D. Ind. 1990) (finding no adequate remedy at law where the plaintiffs sought only declaratory relief and were barred from recovering damages).

### 3. Reasonable Likelihood of Success on the Merits

#### a. Count II

24.     In Count II, NWRA alleges the District's selection of Renewable, a local, Warrick County company, over Advanced, an out-of-state company, was so infected by local favoritism that it amounts to a dormant Commerce Clause violation.

25.     The Commerce Clause refers to Article 1, Section 8, Clause 3 of the U.S. Constitution, which gives Congress the power "[t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes."

26.     "Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit

restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

27.     Accordingly, the Court has made clear that the Commerce Clause "embodies a negative command forbidding the States to discriminate against interstate trade." *Associated Indus. v. Lohman*, 511 U.S. 641, 646 (1994).  In other words, the "negative" or "dormant" Commerce Clause "prohibits economic protectionism -- that is, 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  *Id.* (quoting *New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988)).

28.     "This read effectuates the Framers' purpose to prevent a State from retreating into economic isolation . . . ."  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) (internal quotation marks and citations omitted).

29.     Due to the court's finding that NWRA has a high likelihood of success on Count III, it is unnecessary to evaluate the strength of NWRA's dormant Commerce Clause claim.  *See Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 608 (7th Cir. 2014) (noting that federal courts have a "duty to avoid opining on federal constitutional issues if possible").

30.     The court expresses no opinion on NWRA's likelihood of success on Count II.

### b. Count III

31.     In Count III, NWRA alleges that the District exceeded its authority under Indiana law when it adopted Resolution 2015-03, which created the exclusive curbside collection program.  By adopting Resolution 2015-03, the District allegedly (1) engaged

in franchising or established a territory within Warrick County, (2) established the type of

service Renewable must provide in Warrick County, and/or (3) established the fees that

Renewable must charge in Warrick County.  *See* Indiana Code § 13-21-3-14(b)(2), (b)(3),

and (b)(4).

      32.     Indiana Code § 13-21-3-14(b) provides,

Except as provided in subsection (d) and section 14.5 [IC 13-21-3-14.5] of
this chapter, the powers of a district do not include the following . . .

      (2)  Except as provided in subsection (c), the power to exclusively
control the collection or disposal of any solid waste or recyclables
within the district by means that include the following:

      (A)  Franchising.

      (B)  Establishing a territory or territories within the district in
which a person may provide service.

      (3)  The power to establish the type of service that a person must
provide for the collection or disposal of solid waste or recyclables
within the district.

      (4)  The power to establish fees that a person must charge for the
collection or disposal of solid waste or recyclables within the district.

      33.     Subsections c and d are inapplicable to this case.

      34.     Indiana Code § 13-21-3-14.5 provides an exception to these prohibitions.

That statute provides, in relevant part,

      (b)  Except as provided in subsection (c), a district may not:

      (1)  undertake to provide waste management services by means of its
own work force; or

      (2)  contract with any person to provide waste management services.

      (c)  A district may perform the activities described in subsection (b):

31

(1)  if:

    (A)  the board is able to adopt a resolution under subsection (d); and

    (B)  a private sector entity is not willing or able to provide waste management services at a reasonable cost to the district; or

(2)  if the district is requested to do so by a unit of government that performs the activities with the unit's work force.

(d)  The board may adopt a resolution determining that the district must either provide waste management services by means of its own work force or contract with a person to provide waste management services, only if the board finds that:

    (1)  the waste management service is not currently available in the district at a reasonable cost; and

    (2)  providing the waste management service by means of its own work force or by contract will benefit the public health, welfare, and safety of residents of the district.

The board's determination must be supported with findings of fact.
. . .

(f)  Whenever a district evaluates the reasonableness of cost under this section, it shall:

    (1)  compare the cost of the same level of service provided in the district or in similar demographic areas within Indiana . . . .

35.    In summary, if the District franchised, created a territory, established fees that must be charged, or established the type of service that must be provided, it was required to adopt a resolution with certain determinations supported by findings of fact.

36.    The District agrees with this interpretation of the statutes, but maintains that it did not engage in any of the prohibited conduct alleged by NWRA.  Rather, the District

posits that the court need not even reach Sections 14 and 14.5 because the power to create

this exclusive collection program is permitted by Indiana Code § 13-21-3-12, which

explains:

> Except as provided in section 14.5 [IC 13-21-3-14.5] of this chapter and
> subject to subsection (b), the powers of a district include the following . . .
>
>> (6) The power to enter with any person into a contract or an agreement
>> that is necessary or incidental to the management of solid waste.
>> Contracts or agreements that may be entered into under this
>> subdivision include those for the following . . .
>>
>>> (B) The managing or disposal of solid waste.
>>
>> . . .
>>
>> (16) The power to otherwise do all things necessary for the:
>>
>>> (A) reduction, management, and disposal of solid waste; and
>>>
>>> (B) recovery of waste products from the solid waste stream;
>>
>> if the primary purpose of activities undertaken under this subdivision
>> is to carry out the provisions of this article.

37.     The District therefore emphasizes that it has the power to enter into

contracts and "do all things necessary" to manage solid waste in Warrick County.

Resolution 2015-03 was merely an exercise of that power.

38.     At bottom, this is a question of how the three statutes should be interpreted.

The rules for statutory interpretation are well established in Indiana:

> In interpreting a statute, the first step is to determine whether the Legislature
> has spoken clearly and unambiguously on the point in question. When a
> statute is clear and unambiguous, we apply words and phrases in their plain,
> ordinary, and usual sense. When a statute is susceptible to more than one
> interpretation it is deemed ambiguous and thus open to judicial construction.
> When faced with an ambiguous statute, our primary goal is to determine,

> give effect to, and implement the intent of the Legislature with well-
> established rules of statutory construction.  We examine the statute as a
> whole, reading its sections together so that no part is rendered meaningless
> if it can be harmonized with the remainder of the statute.  And we do not
> presume that the Legislature intended language used in a statute to be applied
> illogically or to bring about an unjust or absurd result.

*Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015) (internal citations, quotation marks, and brackets omitted).

39.     The statutes at issue here are unambiguous.

40.     The District asserts that Section 12 "is not limited" by Section 14.5, but this argument is contradicted by the first words of Section 12: "Except as provided in section 14.5 . . ., the powers of a district include the following . . . ."  The plain language of Section 12 reveals that it is limited by Section 14.5.

41.     The proper way to interpret the three code sections is that Section 12 gives the District the general power to enter into contracts and do "all things necessary" for the management of solid waste, Section 14 imposes limits on specific types of contracts or powers that the District might otherwise have, and Section 14.5 provides a method of overcoming those limitations.  Accordingly, the District cannot invoke the general powers of Section 12 as a defense for violating a specific prohibition in Section 14.  Such an interpretation would render Section 14.5 meaningless.

42.     The District cites to *Hochstedler* in support of its position, but that support is misplaced.  In *Hochstedler*, the St. Joseph County Solid Waste Management District had adopted a resolution that "established a mandatory curbside recycling program" and allowed the district "to charge a mandatory fee for the recycling service."  770 N.E.2d at

913.  The district sued a property owner when she "refused to pay the mandatory monthly recycling fee." *Id.*  The small claims court ruled in favor of the district, and on appeal, the defendant argued that, *inter alia*, the district exceeded its authority under Indiana law because the resolution "exempted certain individuals and entities from the recycling assessment." *Id.* at 921 (internal quotation marks omitted).  *See* Ind. Code § 13-21-14-1(a) (permitting a district board to "establish solid waste management fees . . . that apply to all persons owning real property").  The Court of Appeals disagreed, and emphasized that a district has "the express statutory authority to 'do all things necessary for the . . . reduction, management, and disposal of solid waste.'"  770 N.E.2d at 922 (quoting Ind. Code § 13-21-3-12(a)(16)).

43.  The District states that because the *Hochstedler* court did not mention Section 14.5, "[i]t is obvious that neither it nor the parties viewed that section to limit the general powers of I.C. § 13-21-3-12."  This is a non sequitur.  While it is true that the *Hochstedler* court did not cite to Section 14.5, the District's conclusion does not logically follow from that observation.  Rather, it seems reasonable to believe that the parties simply did not invoke Section 14.5.  There is no indication that the defendant was challenging the district's program based on a lack of findings of fact, so the court had no reason to discuss it.  That is to say, Section 14.5 was not relevant to the issues presented.  Even if the District's conclusion was reasonable, which it is not, the court would consider the plain language of the statute a far stronger authority than an interpretation derived from reading into the silence of a judicial opinion.

44.     Resolution 2015-03 appears to establish (1) a franchise, (2) the type of services that Renewable must provide for the collection of solid waste or recyclables within the District, and (3) the fees for those services.  As such, the District has taken actions that are prohibited by Indiana Code § 13-21-3-14 unless it has complied with Indiana Code § 13-21-3-14.5.

45.     First, while the term "franchise" is not defined in Article 21, Mr. Bradshaw testified that, in the waste hauling industry, the term franchise refers to an exclusive arrangement with a local government for waste collection.  (Bradshaw Test. 37:8-11).  Mr. Bradshaw's testimony is consistent with how other courts have used the term franchise in the context of waste hauling.  *See, e.g., Huish Detergents, Inc. v. Warren Cty.*, 214 F.3d 707, 709 (6th Cir. 2000) ("The franchise agreement provides that all residential, commercial, and industrial entities that generate municipal solid waste in Bowling Green must employ Monarch to remove that waste; waste generators may not remove their own waste, and they are prohibited from using any company other than Monarch."); *S. Waste Sys. v. City of Delray Beach*, 420 F.3d 1288, 1291 (11th Cir. 2005) ("[The Commerce Clause] does not forbid exclusive franchise agreements whereby a city selects one waste hauler to provide basic waste collection services to its citizens, so long as the bidding process is open to all . . . .").

46.     Second, Resolution 2015-03 appears to establish "the type of service that a person must provide for the collection or disposal of solid waste or recyclables within the district."  Ind. Code § 13-21-3-14(b)(3).  Section VI(C) of Resolution 2015-03 establishes the frequency of collection.  (Defendant's PI Ex. T at 3).  Section VI(D) establishes the

type of collection containers that must be used.  (*Id.*).  Section VI(E) establishes the

composition of the containers.  (*Id.* at 4).  Section VI(F) establishes where containers are

to be collected.  (*Id.*).  Finally, Section IX(A) establishes miscellaneous other services

that must be provided.  (*Id.* at 5).  These are all restrictions on the type of services that

must be provided in Warrick County.

      47.    Third, Resolution 2015-03 appears to establish the "fees that a person must

charge for the collection or disposal of solid waste or recyclables within the district."

Ind. Code § 13-21-3-14(b)(4).  Specifically, Section IX of Resolution 2015-03 states that

"[e]ach participant will be charged a monthly service fee of Fourteen and 50/100 Dollars

($14.50) for the base collection service," and goes on to set certain discounts, deductions,

and adjustments to that base monthly fee.  (Defendant's PI Ex. T at 5-6).  Further, Section

VI(D)(1) provides that "[p]articipants may request additional waste containers from

[Renewable] for an additional monthly fee of $2.00 and a one-time refundable deposit to

[Renewable] of $50.00 for each additional waste container."  (*Id.* at 3).

      48.    The District contends it made no effort to establish the fees a hauler must

charge or the type of service a hauler must provide.  Rather, the haulers themselves set

those through the competitive bidding process.  The court disagrees.  Advanced and

Renewable submitted bids to the District explaining that they were willing to offer certain

services at certain prices.  Those bids did not establish anything, as the District was

ostensibly free to ask the bidders to "sharpen their pencils" yet again and come back with

a better price, or even reject both bids and abandon the idea of an exclusive collection

program.  However, when the District accepted Renewable's bid and memorialized the

terms of that bid in Resolution 2015-03, the District established fees that Renewable must charge and the types of service it must provide.  This conclusion is reinforced by the fact that Resolution 2015-03 does not allow Renewable to unilaterally alter its fee or the type of service it provides if its cost of doing business increases.  (*Id.* at 8).

49.     The District also presents what the court construes as an argument in the alternative.  According to the District, Subsections 3 and 4 are intended to prevent a solid waste management district from setting a blanket "type of service" or "fee" that applies to *all* haulers doing business within the district.  Because the District only established fees and types of service for Renewable, there is no violation.  The District cites no authority for this argument though.  Moreover, this interpretation contradicts the plain language of the statutes.  Subsection 4, for example, expressly prohibits a district from "establish[ing] fees that *a person*[4] must charge for the collection or disposal of solid waste or recyclables within the district."  Ind. Code § 13-21-3-14(b)(4) (emphasis added).  The statute does not state "*all* person*s*," but rather "*a* person."  Thus, when a district establishes a fee that *one* hauler must charge, it has violated the statute.

50.     The District was prohibited from establishing the above requirements subject to the limited statutory exception contained in Indiana Code § 13-21-3-14.5(d), which requires findings of fact.

51.     The District admits that Resolution 2015-03 contains no findings of fact. Instead, the District asserts that, if it was required to make findings of fact, then

---

[4] The term "person" is defined broadly to include, *inter alia*, an individual, a partnership, a firm, a company, a corporation, and an association.  Ind. Code § 13-11-2-158(a).

Resolution 2014-01 supplies the necessary findings.  But this argument is directly contradicted by the testimony from District President Williams, (*see* Williams Test. 127:4-6 (Q: There's no findings in 2014-01 with respect to waste hauling.  A: No.)), and Superintendent Anslinger, (*see* Anslinger Test. 114:16-18 ("Q: This resolution doesn't deal with the district's curbside program in any way, does it?  A: No.)), the person who purportedly made the "findings" in Resolution 2014-01.

52.     Further, it is difficult to find support for the District's position in the plain language of Resolution 2014-01.  On its face, Resolution 2014-01 deals only with the construction of the facilities for Phases I, II, and III—not curbside waste and recycling collection.  Indeed the title of Resolution 2014-01 is "Resolution 2014-01 of the Warrick County Solid Waste Management District Regarding a Build Operate Transfer Agreement."  Further, Sections 2 through 5 all identify the construction of Phases I, II, and III as the reason for adopting the resolution.  There is simply no mention whatsoever of solid waste collection in Resolution 2014-01, so this resolution cannot supply the necessary findings of fact under Indiana Code § 13-21-3-14.5 for the collection of solid waste, an integral part of the curbside program.

53.     Regarding recycling collection, the only mention of that service in Resolution 2014-01 is that: "Currently there are significant portions of the District [sic] include residential areas that have no curbside recycling services offered to them."  However, this resolution includes no mention of the reasonableness of the cost of recycling collection services being offered in Warrick County and no comparison of the District's costs (or Renewable's costs) for recycling collection as compared to the costs

of other companies in Warrick County.  This is explicitly required under Indiana Code §
13-21-3-14.5(d)(1), (f)(1).

54.     The District contends that there is a factual basis for the findings of fact in
Resolution 2014-01, but those facts are simply not in the text of the resolution itself.  The
facts were known to members of the Board, and can be discovered by reviewing Board
meeting minutes.  In the words of the District, it just did not show its work.  In support of
this position, the District argues that findings of fact under Section 14.5 are not intended
to be like findings in a court of law, and are instead more akin to the findings of an
administrative agency, which allegedly do not require much detail.  Indiana precedent
suggests otherwise though.  In *Hochstedler*, the Indiana Court of Appeals concluded,

> Generally, a resolution is not the equivalent of an ordinance because a
> resolution "denotes something less formal than 'ordinance.'"  BLACK'S
> LAW DICTIONARY 1311 (6th ed. 1990).  However, because Ind. Code §
> 13-21-3-12(17) bestows upon the District the power to adopt resolutions that
> have the force of law, we review Resolution 5-97 as if it were an ordinance.

770 N.E.2d at 914 n.2.  The court added, "Interpretation of an ordinance is subject to the
same rules that govern the construction of a statute."  *Id.* at 914.

55.     Resolution 2015-03 has the force of law, as it creates an exclusive curbside
program and establishes civil penalties for those who violate the terms of the resolution.
Therefore, Resolution 2015-03 and Resolution 2014-01, as it allegedly contains the
findings of facts necessary to implement Resolution 2015-03, must be evaluated like an
ordinance or statute, not like an order subject to the Indiana Administrative Orders and
Procedures Act ("AOPA").  As discussed above, the resolutions do not survive this type
of scrutiny.

56.     Moreover, even if the General Assembly intended for findings under Section 14.5 to be similar to an administrative agency's findings, the District's findings here would still be inadequate.  According to the Indiana Court of Appeals,

> Under AOPA, a final order by an administrative agency must present written findings of fact, including "findings of ultimate fact . . . *accompanied by a concise statement of the underlying basic facts of record to support the findings*" as well as "conclusions of law for all aspects of the order."

*Pack v. Ind. Family & Soc. Servs. Admin.*, 935 N.E.2d 1218, 1222 (Ind. Ct. App. 2010) (quoting Ind. Code § 4-21.5-3-27(b), (c)) (emphasis added).

57.     In Resolution 2014-01, the District does not provide a "concise statement of the underlying basic facts of record to support the findings."  Ind. Code § 4-21.5-3-27(b), (c).

58.     Therefore, Resolution 2014-01 does not comply with Indiana Code § 13-21-3-14.5 with respect to the collection of solid waste and recyclable materials.

59.     The court finds that NWRA has a high probability of success on Count III. [5] Importantly though, this conclusion is based upon the present record.  The court's evaluation of Count III could change after additional evidence is presented.

---

[5] The District contends, "Even if one assumes that SWD was required to comply with I.C. § 13-21-3-14.5 and that there were insufficient findings, an injunction and voiding of the entire Program (which would necessarily include the curbside contract with Renewable) as requested by NWRA and its members is not the proper remedy.  The proper remedy when an administrative board fails to make required findings of fact is to remand to the board to enter findings of fact in support of its conclusion."  (Filing No. 47, District's Proposed Findings and Conclusions at 40).  In the words of the Seventh Circuit, "This perfectly ordinary argument is out of place."  *United States v. Mosley*, 967 F.2d 242, 243 (7th Cir. 1992).  It would be inappropriate for the court to order the District to make further findings of fact, as the court has not yet determined that Section 14.5 was violated.  For purposes of a preliminary injunction motion, the court does not conclusively decide upon the merits of a plaintiff's allegations.  Rather, the court only examines the probability of success on the merits.  Accordingly, this argument is more

### 4. Balancing the Harms

60.     Again, the court uses a "sliding scale" when balancing the harms.  *Turnell*, 796 F.3d at 662.  Because the court has found that NWRA has a high likelihood of success on Count III, the court must issue an injunction even if the balance of harms does not overwhelming weigh in NWRA's favor.  *Id.*

61.     "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief."  *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (internal citations and quotation marks omitted).

62.     "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'"  *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)) (alteration original) (some quotation marks omitted).

### a. Harm to NWRA if Injunctive Relief is Denied

63.     Advanced will lose $76,000 in revenue each month and may have to lay off or terminate several employees.  (Bradshaw Test. 62:11-19).

64.     The parties stipulated that Republic will lose more than $75,000 unless the District's curbside program is enjoined.

---

properly raised in the event that NWRA succeeds on the merits and the court is considering whether to enter a permanent injunction.

65.     If NWRA's members are unable to service many parts of Warrick County until obtaining a favorable judgment, they will likely lose goodwill with their customers.

**b. Harm to the District if Injunctive Relief is Granted**

66.     The District may be unable to procure sufficient recyclables needed to generate revenue to sustain its program.  (Anslinger Test. 151:14-152:16).

67.     The District did not present evidence from which the court can derive the precise amount of damages it will incur if an injunction is granted.  Rather, the record merely reflects that the District may be unable to meet its monthly operational expenses of approximately $70,000, including a $26,000 monthly mortgage payment and salaries for at least twenty part-time employees.  (*Id.* 156:20-157:3; Weisheit Test. 89:23-90:6).

68.     These two harms exist in the status quo, and it is unclear if they are tied to the fact that Resolution 2015-03 is not currently being enforced (which would continue if the court granted NWRA's request for a preliminary injunction) or problems at the Pelzer Road Facility.  To explain, Advanced has been unable to take all of its recyclables to the processing center because of "mechanical issues" at the facility.  (Bradshaw Test. 84:4-85:1).  According to Mr. Anslinger, the District is currently unable to accept all recyclables because the operation is "still in the start-up phase" and having "start-up problems."  (Anslinger Test. 177:24-178:25).

69.     The District claims that it may be unable to fulfill its agreement with the Town of Newburgh to accept and process all recyclable materials collected by Advanced in its curbside program, but it is unclear how an injunction would affect that agreement.

**c. Effect on Non-Parties if Injunctive Relief is Granted**

70.     The District claims that if an injunction is issued: (a) curbside recycling services will not be provided to large segments of Warrick County; (b) recycling participation will decrease; (c) the legislature's goal of reducing landfill deposits by 50% will not be realized; and (d) areas within the county will need to be cleaned on a periodic basis due to improper disposal of solid waste.  Yet, it is unclear how an injunction would result in any of this.  If the injunction is granted: (a) nothing would prevent haulers from servicing any segment of Warrick County; (b) and (c) nothing would prevent residents from recycling at the same rate; and (d) nothing would entice residents to dispose of their waste improperly.

71.     Renewable has hired twelve employees and invested approximately $2,000,000 in preparation for meeting their contractual obligations with the District. (Aigner Test. 247:13-20, 249:7-8).  If an injunction were to issue, Renewable may have to lay off or terminate some of those employees.  (*Id.* 249:3-10).  Additionally, Mr. Aigner testified that Renewable's investment "would be a downfall," but it is unclear what he meant by that.  The investment will not be a total loss regardless of the outcome in this case.  Renewable has many households to service in the status quo, and will likely continue to service many households if an injunction is granted.

72.     The District argues that Warrick County residents will "continue paying inconsistent and often very high rates for collection services by other haulers" if the injunction is granted, but the court is skeptical of this assertion.  Initially, the District fails to explain why different rates in different parts of Warrick County is necessarily a bad or

44

unfair thing.  Further, the District's concern about high prices seems unfounded, as there is no evidence to indicate that Renewable will raise its prices above the $14.50 rate it currently has if the injunction is granted.  Further, as previously noted, after the court adopted the parties' interim agreement, some of NWRA's members advertised promotional prices "below the contract price contained in Renewable's proposal." (Counterclaim at 4).  Thus, some Warrick County residents are actually paying rates lower than what they would pay if Resolution 2015-03 went into full effect.

73.     There may be health concerns related to waste sitting on the curb multiple days each week.  (Weisheit Test 79:9-13).  However, the court is not convinced that this is a significant issue.  The District did not call any public health experts to testify to that effect.

74.     There will be an increase in heavy-duty trucks travelling within residential areas, causing air and noise pollution, safety concerns, and wear and tear on public roadways.  (Anslinger Test. 164:24-165:17; Weisheit Test. 78:13-14, 79:9-11, 87:18-21).

### d. Summary

75.     If the court does not issue an injunction: (1) Advanced will lose $76,000 a month in revenue; (2) Republic will also suffer substantial financial losses; (3) Advanced may have to lay off or terminate employees, and (4) NWRA's members will lose goodwill in Warrick County.

76.     If the court issues an injunction: (1) the District may be unable to meet its monthly operational expenses of approximately $70,000, which includes a mortgage

payment; (2) Renewable may have to lay off or terminate employees; and (3) there will be an increase in heavy-duty trucks travelling within residential areas.

77.     Even without considering the effect of the "sliding scale," the harms arising from not issuing an injunction are more substantial than those that would arise from issuing an injunction.  Initially, employees may be terminated regardless of the court's decision, so those harms effectively cancel each other out.  Similarly, there will be financial harm no matter how this motion is decided.  However, this harm slightly favors injunctive relief because it appears that the financial harm would be greater if the court denied NWRA's motion. Further, the financial harm to NWRA's members is not speculative.  As previously noted, the District's financial harm already exists in the status quo and it is unclear if issuing an injunction would actually have any effect on the problem because there are mechanical problems at the Pelzer Road Facility.  If the mechanical problems are now fully resolved, nothing would prevent haulers in Warrick County from taking all of their recyclables to the Pelzer Road Facility, which would alleviate the District's revenue concerns.

78.     The court places substantial weight on the potential harm to the goodwill of NWRA's members.

79.     While it cannot be denied that there are problems associated with a greater number of heavy-duty trucks traveling in a given area, the court does not place significant weight on this harm.  Because Warrick County is a relatively small community, the number of additional heavy-duty trucks on the roadways is likely to be small.  This

means that the impact of those few additional trucks will likely be small as well. There was no expert testimony on this subject.

80.     The court therefore finds that the balance of harms favors granting NWRA's request for injunctive relief.

81.     Having satisfied all of the elements set forth in *Turnell*, NWRA's motion for a preliminary injunction shall be granted.

### 5. Bond

82.     "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

83.     "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him . . . ." *Ty, Inc. v. Publ'Ns Int'l*, 292 F.3d 512, 516 (7th Cir. 2002). *See Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) ("Any slight risk can and should be ameliorated by an injunction bond under Fed. R. Civ. P. 65(c).").

84.     The amount of the bond is left to the court's discretion. *Gateway*, 35 F.3d at 1141.

85.     The District never requested a bond (and therefore did not recommend an amount) in its filings or at the preliminary injunction hearing.

86.     Whereas the court finds that NWRA has a high probability of success on the merits, the court exercises its discretion by setting the bond in the amount of Fifty Thousand Dollars ($50,000.00).

### D. The District's Motion for Preliminary Injunction

87.     Though the District's Counterclaim purportedly seeks a preliminary injunction, the District did not actually file a motion for preliminary injunctive relief. This was in violation of a clear mandate found in the Local Rules: "The court will consider a request for preliminary injunction *only if* the movant files a separate motion for relief and complies with Fed. R. Civ. P. 65(a)."  S.D. Ind. L.R. 65-2(a) (emphasis added).

88.     The District states that it did not file a separate motion because the court "ha[d] already set NWRA's motion for preliminary injunction for evidentiary hearing on January 21, 2016."  (Filing No. 40, Response to NWRA's Motion to Dismiss at 1).  This explanation is difficult to understand, and the court does not find it to be reasonable.  The court's decision to set NWRA's motion for a hearing in no way prevented the District from filing its own motion.

89.     To the extent that the District has moved for a preliminary injunction, the motion must be denied.

### III. CONCLUSION

The court finds that NWRA has satisfied its burden to obtain a preliminary injunction of Resolution 2015-03, which establishes an exclusive curbside solid waste

and recycling collection program in Warrick County.  Therefore, NWRA's Motion for

Preliminary Injunction (Filing No. 5) is **GRANTED**.

The District is hereby **ENJOINED** from enforcing Resolution 2015-03 against

NWRA's members or any other person who desires to collect solid waste and recycling

in Warrick County.  "Covered participants," as defined in Resolution 2015-03, may use

any hauler for waste and recycling pickup services.  The District may not seek civil

penalties, attorneys' fees, court costs, or any other fees from any person who provides

waste and recycling pickup services to covered participants.

As a condition of the preliminary injunction, NWRA is ordered to post a bond in

the amount of $50,000.00 to secure payment of any damages sustained by the District if it

is later found to have been wrongfully enjoined.  The bond shall be posted within seven

days of the date of this Entry.

To the extent that the District has moved for a preliminary injunction via its

Counterclaim (Filing No. 30), that motion is **DENIED** pursuant to Local Rule 65-2(a).


**SO ORDERED** this 29th day of March 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.